WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Michael F. Walsh (MFW 8000)
Paul M. Basta (PMB 4434)

Attorneys for Debtors and
 Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                          :
                                                               :     **Chapter 11 Case No.**
                                                               :
**GLOBAL CROSSING LTD., <u>et al.</u>,**                       :     **02-40188 (REG)**
                                                               :
                               Debtors.                        :     **(Jointly Administered)**
                                                               :
-------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363(b)(1),
1121, 1127, AND 1142(b) OF THE BANKRUPTCY CODE SEEKING
APPROVAL OF (i) AN AMENDMENT TO THE DEBTORS' JOINT PLAN
OF REORGANIZATION WITHOUT THE NEED FOR FURTHER
SOLICITATION OF VOTES, (ii) AMENDMENT NUMBER 5 TO THE
PURCHASE AGREEMENT, AND (iii) EXTENSION OF THE
EXCLUSIVE PERIODS DURING WHICH DEBTORS MAY
<u>FILE A CHAPTER 11 PLAN  AND SOLICIT ACCEPTANCES THEREOF</u>**

TO THE HONORABLE ROBERT E. GERBER,
UNITED STATES BANKRUPTCY JUDGE:

               Global Crossing Ltd. ("<u>GCL</u>") and its debtor subsidiaries, as debtors in

possession, respectfully represent:

<u>**Background**</u>

               1.       On January 28, 2002 (the "<u>Commencement Date</u>"), GCL and

certain of its subsidiaries (such entities, together with their affiliates that commenced

cases on April 24, 2002, August 4, 2002 and August 30, 2002, "Global Crossing" or the "Debtors") each commenced a case in the United States Bankruptcy Court for the Southern District of New York under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      No trustee has been appointed in these cases. On February 7, 2002, the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee"). On November 21, 2002, the Court entered an order directing the appointment of an examiner (the "Examiner") to review certain financial and accounting records of the Debtors. On November 25, 2002, the U.S. Trustee appointed Martin E. Cooperman as the Examiner.

3.      Global Crossing provides telecommunications solutions over the world's first integrated IP-based network (the "Network"), which reaches 27 countries and more than 200 major cities around the globe. The Network took over four years, multiple acquisitions and partnerships, and billions of dollars of capital to reach its current state of near-completion.

4.      Each of the Debtors incorporated in Bermuda (collectively the "Bermuda Group") has commenced a coordinated proceeding in the Supreme Court of Bermuda. The Supreme Court of Bermuda has issued an order appointing certain principals of KPMG International as Joint Provisional Liquidators (the "JPLs") of the Bermuda Group. The Supreme Court of Bermuda has directed the JPLs to oversee the continuation of Global Crossing under the control of its Board of Directors and under the

supervision of the Supreme Court of Bermuda and this Court in effecting a plan of reorganization under the Bankruptcy Code.

5.      On August 9, 2002, the Court approved that certain purchase agreement (the "Purchase Agreement") among GCL, Global Crossing Holdings Ltd., the JPLs, Singapore Technologies Telemedia Pte Ltd. ("ST Telemedia"), and Hutchison Telecommunications Limited ("Hutchison"). Pursuant to the Purchase Agreement, the Debtors were required to file a plan of reorganization to implement the transactions contemplated by the Purchase Agreement.

6.      On September 16, 2002, Global Crossing filed with the Court the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (as such plan may be amended from time to time, the "Plan") and the Disclosure Statement with respect to the Plan. On October 21, 2002, the Court entered an order approving the Disclosure Statement.

7.      Commencing on December 4, 2002, hearings were held in respect of confirmation of the Plan. On December 26, 2002, the Court entered an order confirming the Plan (the "Confirmation Order"). Under the Plan, all of the Debtors' business operations and substantially all their assets will be transferred to a new company ("New Global Crossing"), 61.5% of which will be owned by ST Telemedia and 38.5% of which will be owned by certain creditors of the Debtors.

8.      On April 30, 2003, in accordance with the terms of the Purchase Agreement, Hutchison terminated its rights and obligations under the Purchase Agreement and ST Telemedia assumed Hutchison's rights and obligations thereunder.

9.     The consummation of the Purchase Agreement (and therefore the consummation of the Plan) was contingent on obtaining regulatory approvals from various state, federal, and foreign agencies or jurisdictions.  The Debtors and the Investors originally anticipated that all necessary regulatory approvals under the Purchase Agreement would be obtained by April 30, 2003.  Due to the increase in the ownership percentage of New Global Crossing to be held by ST Telemedia (from 30.75% to 61.5%), however, the Debtors were required to amend certain regulatory filings already obtained and re-file certain others, including those of the Federal Communications Commission ("<u>FCC</u>") and the Committee on Foreign Investment in the United States ("<u>CFIUS</u>").

10.     The Purchase Agreement provides for a voluntary termination date, originally of April 30, 2003, after which it is terminable by either the Debtors or ST Telemedia (the "<u>Voluntary Termination Date</u>").  Accordingly, by motion dated May 14, 2003 (the "<u>Extension Motion</u>"), the Debtors sought Court approval of, among other things, extension of the Voluntary Termination Date to October 14, 2003.  The Extension Motion was opposed by a number of parties, including the Debtors' prepetition bank lenders (the "<u>Banks</u>") and XO Communications, Inc. ("<u>XO</u>").  Following a week-long contested hearing, the Court approved the Extension Motion.  The Debtors obtained CFIUS approval on September 19, 2003 and FCC approval on October 8, 2003.

11.     Following the receipt of the necessary regulatory approvals, the Debtors worked diligently to prepare for the closing of the Purchase Agreement.  However, due to certain difficulties the Debtors encountered in finalizing the collateral package that will secure the Notes (as defined below), the Debtors sought two additional extensions of the Voluntary Termination Date by motions dated October 16, 2003, and

November 14, 2003 (the "Additional Extension Motions").  By orders dated October 27, 2003 and December 1, 2003 (the "December Order"), the Court approved the Additional Extension Motions.  Pursuant to the December Order, the Voluntary Termination Date is currently December 5, 2003.

## Jurisdiction

12.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § § 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409.

## Relief Requested

13.     The $200 million of New Senior Secured Notes to be issued under the Plan (the "Notes") have presented a number of significant hurdles to the Debtors' emergence from chapter 11.  Some of those issues have been resolved through negotiations with the agent for the Banks (the "Agent").  However, the Debtors have not been able to resolve other issues, including the ability to obtain exit financing as permitted by the Plan (the "Working Capital Facility") or, most recently, the dispute concerning the financial assistance provisions of the English Companies Act.

14.     It has become clear to the Debtors and ST Telemedia that a consensual resolution of these issues will be difficult, if not impossible, to attain on reasonable terms.  In order to avoid further controversy, frustration, and delay related to the issuance of the Notes to the Banks, the Debtors propose to amend the Plan to provide $200 million of cash in lieu of the $200 million of Notes.  Substitution of cash for the Notes will not be a material change to the Plan because the Notes, by their terms, are prepayable at any time, without premium or penalty.  On the effective date of the Plan

(the "Effective Date"), a subsidiary of GCL will issue new secured notes to ST Telemedia or its designee in exchange for the $200 million of additional cash needed to fund the change in the Plan. The new notes will be on terms no less favorable to New Global Crossing than the Notes.

15. By this motion, the Debtors seek an order approving a modification of the Plan without the need for resolicitation. The Debtors also seek to (i) amend the Purchase Agreement to extend the Voluntary Termination Date until Friday, December 19, 2003, and (ii) extend the Debtors' exclusive right to file a chapter 11 plan and solicit acceptances thereof until two weeks after the extended Voluntary Termination Date. The extension of the Voluntary Termination Date and the exclusivity periods are to permit the Debtors and ST Telemedia to finalize the arrangements for closing and the Debtors' emergence from chapter 11 in accordance with the provisions of the Plan. The Debtors are hopeful that the closing will occur well before December 19, 2003, but seek to extend to such date to help ensure that further extensions will not be required.

**The Notes**

16. As part of the consideration being provided to certain creditors under the Plan, a subsidiary of GCL will issue the Notes. The Notes will be issued pursuant to an indenture (the "Indenture"), have a maturity of 3 years, and bear interest at the annual rate of 11% (paid semi-annually). The Notes may be prepaid at any time without penalty or premium. Section 3.07 of the Indenture (the "Optional Redemption Provision"), provides:

The Issuer may at any time, and from time to time, at its option, redeem the Notes in whole or in part, in a minimum aggregate redemption amount of $5,000,000, upon not less than 30 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of thereof, plus accrued and unpaid interest thereon, if any, to the applicable redemption date….

17.     The terms of the Notes are set forth on Exhibit A-3 to the Purchase Agreement and in the Indenture.  Exhibit A-3 and the Indenture provide that the Notes will be guaranteed by (i) Global Crossing Intermediate UK Holdings Ltd. and its subsidiaries (collectively "GCUK"), which owns the Debtors' terrestrial network in the United Kingdom, (ii) Global Marine Systems Limited and its subsidiaries (collectively, "Global Marine"), which provides undersea cable maintenance to the Debtors and third parties, and (iii) all of New Global Crossing's other material subsidiaries.

18.     Such guaranties will be secured by a first priority lien on the assets of GCUK and Global Marine and a second priority lien on all the assets of the other guarantors.  The liens on the assets of New Global Crossing (with the exception of GCUK and Global Marine) will be junior to liens granted to secure the Working Capital Facility.  Exhibit A-3 provides that the Working Capital Facility may not exceed $150 million.  The rights to the collateral between the holders of the Notes and prospective lenders under the Working Capital Facility are governed by the terms of an intercreditor agreement, filed as part of the Plan Supplement (the "Intercreditor Agreement").

19.     Pursuant to the Plan, $175 million of the Notes are to be issued to the Banks, with the remainder to be divided among certain other classes of creditors.

**<u>Issues Related to the Notes</u>**

20.     The terms of the Indenture and the Intercreditor Agreement have raised two sets of issues.  First, the terms of the Intercreditor Agreement have made it extremely difficult for the Debtors to arrange a Working Capital Facility with prospective lenders.  The Debtors and ST Telemedia have been unable to reach satisfactory commercial terms for the Intercreditor Agreement with the Banks to enable the Debtors to obtain a Working Capital Facility with reasonable, market provisions as to cross-defaults and acceleration rights.

21.     Second, the granting of enforceable, perfected liens on property located throughout the world has proven difficult and extremely expensive due to the requirements of foreign law and the differences between those foreign laws and the laws of the United States.  Most of the local law issues have been worked out between the Debtors and the Agent.  Changes to the Plan, the Indenture, and related documents to reflect those agreements previously have been submitted to the Court for approval.  On November 10, 2003, the Court "so ordered" the record approving those changes.

22.     On November 20, 2003, the Debtors filed a motion (the "<u>Intercompany Transfer Motion</u>") for approval of minor modifications to the subsidiary corporate structure of New Global Crossing and the transfer and release of certain intercompany claims in order to solve the last of those local issues – the financial assistance provisions of the English Companies Act.  As detailed in the Intercompany Transfer Motion, the Debtors undertook significant efforts to ensure that the guaranties and grant of liens by GCUK and Global Marine would be enforceable.

23.    Unfortunately, the Intercompany Transfer Motion drew vociferous objections from the Agent on behalf of the Banks and from XO, the holder of the largest amount of prepetition bank debt.  The Banks asserted that the Debtors had somehow caused a material change in the treatment under the Plan to occur, requiring a resolicitation.  It has become quite clear to the Debtors that the objections by the Banks and XO would result in yet another trial, potentially costing millions of dollars in additional professional fees.

### The Proposed Plan Amendment

24.    The Debtors propose to amend Sections 4.3, 4.4, 4.5, and 4.6 of the Plan to substitute an equivalent amount of cash for the principal amount of Notes to be distributed to Classes C, D, E, and F.   The Debtors also propose to add a new Section 5.19 to the Plan (and all related documents, including guaranties and collateral documents) to provide for the issuance of the Notes to ST Telemedia or its designee. Conforming changes will also be made to the Transaction Documents (as defined in the Plan), including the reimbursement after closing of the fees and expenses of ST Telemedia.  The Debtors will provide conformed copies of the Plan and the Transaction Documents, as revised, to the Agent and the Creditors Committee before closing.

25.    The proposed amendments to the Plan are intended to (i) give creditors who would otherwise receive Notes on the Effective Date a distribution of an equivalent amount of cash, (ii) reduce the expense of the worldwide collateral project, (iii)  avoid another costly trial, and (iv) allow the Debtors finally to emerge from chapter 11.

## Modifying a Plan of Reorganization
## <u>Without Re-soliciting Acceptances</u>

26.     Section 1127, in relevant part, provides:

(b)  The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

(c)  The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

(d)  Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. §1127.  Thus, section 1127 of the Bankruptcy Code requires that, in order to modify a confirmed plan of reorganization, the proposed modification must comply with, among other things, the disclosure requirements of section 1125 of the Bankruptcy Code.

27.     The legislative history of section 1127(c) makes clear that not all modifications to a confirmed plan require new disclosure.  <u>See</u> H. Rep. No. 595, 95th Cong., 1st Sess., 411 (1977) ("if the modification were sufficiently minor, the court might determine that additional disclosure was not required under the circumstances").  A number of courts have held that further disclosure and resolicitation of the modified plan is required only when the modification materially <u>and</u> adversely impacts parties who previously voted for the plan.  <u>See</u> <u>In re Century Glove, Inc.</u>, 1993 U.S. Dist. LEXIS 2286, *12 (D. Del. Feb. 10, 1993); <u>In re Am. Solar King Corp.</u>, 90 B.R. 808, 823-24 (Bankr. W.D. Tex. 1988).  <u>See</u> <u>also</u> <u>Resolution Trust Corp. v. Best Prods. Co., Inc.</u> (<u>In re</u>

Best Prods., Inc.), 177 B.R. 791, 802 (S.D.N.Y. 1995) ("The court cannot adopt any

modification that materially alters the plan and adversely affects a claimant's treatment.")

(emphasis added).

28.     Courts have held that proposed plan modifications are not adverse

where "[n]one of the changes negatively affects the repayment of creditors...." See, e.g.,

In re Mount Vernon Plaza Community Urban Redevelopment Corp. I, 79 B.R. 305, 306

(Bankr. S.D. Ohio 1987); see also Solar King at 823, n27 ("The modified plan need not

be resubmitted to creditors and interest holders if the court finds that they are not

adversely affected.") (internal citations omitted).

**The Proposed Plan Amendment Does Not Adversely Change the
Treatment of Any Party Receiving a Distribution Under the Plan**

29.     Under the Plan as confirmed by the Court, creditors are to receive

cash, Notes, common stock of New Global Crossing, and beneficial interests in a

liquidating trust.  As described above, the proposed amendment to the Plan makes two

changes.  First, it substitutes $200 million of cash for the $200 million of Notes to be

distributed.  Second, it provides for the issuance of $200 million of new notes to ST

Telemedia on terms that are no less favorable to New Global Crossing than the Notes.

30.     The Debtors submit that neither of the changes adversely affects

any party receiving a distribution under the Plan.  In particular, the substitution of cash

removes all risk of repayment of the Notes, including the risks described in the Agent's

objection to the Intercompany Transfer Motion on behalf of the Banks.  Moreover, the

substitution of cash should not affect the expectations of creditors because the Notes, by

their own terms, are prepayable at any time without premium or penalty. Disclosure Statement at 22.

31.     The Proposed Plan Amendment also does not adversely affect creditors receiving the common stock of New Global Crossing. ST Telemedia will take back notes on terms no less favorable to New Global Crossing than the Notes. Moreover, under the Plan, there is no restriction on the issuance of notes to ST Telemedia as long as such notes are on commercial terms. Purchase Agreement, at Exhibit A-2.

32.     Since the Court entered the Confirmation Order, the parties have worked diligently to consummate the Plan. The Debtors have overcome a number of significant hurdles, including obtaining regulatory approvals in a post-9/11 environment. The proposed Plan amendment is intended to remove the last of those hurdles.

33.     Approval of the proposed Plan amendment will have the following benefits to the Debtors and their creditor constituencies. First, it will remove all risk of repayment of the Notes. Second, the Debtors believe that the issuance of the Notes to ST Telemedia will improve New Global Crossing's ability to arrange a Working Capital Facility. Third, it will avoid the costs of a trial on the Intercompany Claim Motion. Fourth, the proposed amendment will avoid the necessity and expense of actually issuing the Notes to creditors and then following the Option Redemption Provision procedures to prepay the Notes. Most importantly, the amendment will facilitate the consummation of the Plan and the distribution of Plan consideration to the Debtors' creditors.

34.     For the foregoing reasons, the Debtors request that the Court approve the proposed Plan amendment. In addition, due to the numerous obstacles they have faced in emerging from chapter 11, the Debtors also request that the Court enter an

order, pursuant to section 1142(b) of the Bankruptcy Code, ordering all necessary parties to execute and/or deliver any instrument or document required to close the Purchase Agreement or necessary to consummate the Plan.

### Amendment No. 5 to the Purchase Agreement

35.     The fundamental basis for the Plan is the Purchase Agreement with ST Telemedia.  On Closing, ST Telemedia will invest $250 million for 61.5% of the equity in New Global Crossing.  The Voluntary Termination Date under the Purchase Agreement is scheduled to occur on December 5, 2003.  In order to allow for an orderly Closing, the Debtors propose to extend the Voluntary Termination Date.  The Debtors believe that a further extension is justified in light of the unanticipated delays in closing due to resolving foreign law issues, including the financial assistance provisions of the English Companies Act.

36.     Pursuant to this motion, the Debtors seek approval of Amendment Number 5 to the Purchase Agreement ("Amendment No. 5"), which extends the Voluntary Termination Date through December 19, 2003.  The Debtors believe that the Plan amendment described above will remove the last impediment to Closing and their emergence from chapter 11.  However, the Debtors need to ensure that both parties are locked in to the Transaction to allow sufficient time to close following the ultimate resolution of the issues surrounding the Indenture (whether by approval of the proposed Plan amendment or otherwise).  Accordingly, the Debtors seek to extend the Voluntary Termination Date to December 19, 2003, to complete this process and commence making distributions to creditors

37.     The Debtors also seek to extend the exclusive period during which the Debtors may (i) file a chapter 11 plan (the "Exclusive Filing Period") to the earlier of (A) January 5, 2004, or (B) in the event the Purchase Agreement is terminated in accordance with its terms by any of the parties thereto, two weeks from the date of such termination and (ii) solicit acceptances of such plan (the "Exclusive Solicitation Period") until sixty (60) days after the extended Exclusive Filing Period.  Extending the Voluntary Termination Date will enable the Debtors to continue to work toward Closing with an assured commitment from ST Telemedia and absent any distractions that could be brought on without such an extension, while extending the Exclusive Filing Period and Exclusive Solicitation Period (together, the "Exclusivity Periods") will allow the Debtors, in the situation that the Transaction cannot close, to propose and solicit a new plan of reorganization without the distractions of competing plans.

### Approval of Amendment No. 5
### Is Supported by the Business Judgment of the Debtors

38.     In the Purchase Agreement, the Debtors and ST Telemedia contemplated amendments thereof.  Pursuant to section 8.6 of the Purchase Agreement, the Debtors and ST Telemedia may amend the Purchase Agreement in a writing executed and delivered by the Debtors and ST Telemedia.  By orders dated July 8, 2003, and October 27, 2003, and December 1, 2003, this Court approved the second, third, and fourth amendments to the Purchase Agreement.

39.     Pursuant to Amendment No. 5, the definition of "Outside Date" in section 8.1 of the Purchase Agreement is amended and restated to read "December 19, 2003."  By this modification, the Voluntary Termination Date is extended from

December 5, 2003, to December 19, 2003. The other provisions of Amendment No. 5 are identical to the provisions of Amendment No. 4, previously approved by the Court.

40. The Debtors' contractual rights under the Purchase Agreement are property of the estate, see, e.g., LTV Corp. v. Aetna Casualty and Surety Co. (In re Chateaugay Corp.), 116 B.R. 887, 898 (Bankr. S.D.N.Y. 1990), and therefore, any use of such property outside the ordinary course of business is governed by section 363 of the Bankruptcy Code.

41. Although Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the use of property of the estate, courts in the Second Circuit and others, in applying this section, have required that it be based on the sound business judgment of the debtor. In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a § 363(b) application must find from the evidence presented before him a good business reason to grant such application); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (holding that the "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith).

42. In a similar vein as was explained in the Debtors' Motion (the "Fourth Amendment Motion") for Approval of Amendment Number 4 to the Purchase

Agreement ("Amendment No. 4") with regards to Amendment No. 3, the final stages to complete the Collateral Package have presented numerous complex legal and factual issues and has unforeseeably taken longer than anticipated when the Debtors filed the Fourth Amendment Motion. In light of the delay in completing the Collateral Package and the Debtors' determination to seek approval of the proposed Plan amendment, the Debtors and ST Telemedia both seek the added assurance of a formal, Court-approved extension of the Voluntary Termination Date that will lock in both parties' commitments through the Closing.

43.     Although this is the fourth extension of the Voluntary Termination Date, the Debtors believe that the proposed Plan amendment will enable the Debtors to consummate the Plan and begin making distributions to creditors. At this critical juncture, as the Debtors are truly on the cusp of emergence from chapter 11, it is imperative that the Debtors and ST Telemedia are "locked in" to the Purchase Agreement. Thus, the Debtors have determined, in their sound exercise of business judgment, that Amendment No. 5 is in the best interests of the Debtors, their creditors, and all parties in interest.

<u>**Exclusivity**</u>

44.     From the commencement of their chapter 11 cases and by operation of section 1121 of the Bankruptcy Code, the Debtors have maintained the exclusive right to file a plan of reorganization and solicit acceptances thereof. The December Order extended (i) the Exclusive Filing Period to the earlier of (A) December 19, 2003, or (B) in the event the Purchase Agreement is terminated in accordance with its terms by any of the parties thereto, two (2) weeks from the date of such termination; and

(ii) the Exclusive Solicitation Period for sixty (60) days after the extended Exclusive

Filing Period. The Debtors now seek to extend further (i) the Exclusive Filing Period to

the earlier of (A) January 5, 2004, or (B) in the event the Purchase Agreement is

terminated in accordance with its terms by any of the parties thereto, two weeks from the

date of such termination and (ii) the Exclusive Solicitation Period until sixty (60) days

after the extended Exclusive Filing Period.

       45.     Section 1121(b) of the Bankruptcy Code provides for an initial

period of 120 days after the commencement of a chapter 11 case during which a debtor

has the exclusive right to propose and file a chapter 11 plan. Section 1121(c)(3) of the

Bankruptcy Code provides that if the debtor files a plan within the 120 days after the

commencement of a case, the debtor has a period of 180 days after the commencement of

the cases to obtain acceptance of such plan, during which time competing plans may not

be filed.

       46.     Section 1121(d) of the Bankruptcy Code permits the court to

extend a debtor's exclusive periods upon a demonstration of "cause." Section 1121(d)

provides:

> On request of a party in interest made within the
> respective periods specified in subsections (b) and (c) of
> this section and after notice and a hearing, the court may
> for cause reduce or increase the 120-day period or the 180-
> day period referred to in this section.

11 U.S.C. § 1121(d).

       47.     Although the Bankruptcy Code does not define the term "cause,"

the legislative history indicates it is intended to be a flexible standard to balance the

competing interests of a debtor and its creditors. See H.R. Rep. No. 95-595, at 231, 232

(1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6191.  The Court has enumerated the following factors, which should be considered when determining whether exclusivity should be extended:

> (a) the size and complexity of the debtor's case;
> (b) the existence of good faith progress towards reorganization;
> (c) a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the debtors'] reorganization demands";
> (d) existence of an unresolved contingency [e.g., ongoing negotiations that will not conclude within the Exclusive Periods, but where the subject matter of the negotiations is vital to reorganization and, if successful, the negotiations would likely enable the debtor to file a successful plan of reorganization]; and
> (e) the fact that the debtor is paying its bills as they come due.

<u>In re McLean Indus., Inc.</u>, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).

### Cause Exists to Extend the Exclusivity Periods

48.     Each factor set forth in <u>In re McLean Indus., Inc.</u> weighs toward granting an extension of the Exclusivity Periods.  Although the Debtors' believe that the issues surrounding the Collateral Package and the Indenture will be favorably resolved soon, the Parties need additional time to prepare for the Closing.  Although the Debtors do not foresee any significant delays to Closing following such resolution, they want to ensure that there is sufficient time to finalize all the documents needed for the Closing.  In the event that the Parties cannot close the Transaction, the Debtors will need additional time to formulate and file a new plan of reorganization without having the destabilizing effects of competing plans.

## Notice

49.     No trustee has been appointed in the Debtors' chapter 11 cases. Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) the attorneys for the Creditors' Committee, (iii) the attorneys for the agent for the Debtors' prepetition lenders, (iv) the JPLs and their attorneys, and (v) those parties entitled to notice pursuant to this Court's order dated January 28, 2002, establishing certain notice procedures in these chapter 11 cases. The Debtors submit that no other or further notice need be provided.

## Waiver of Memorandum of Law

50.     Pursuant to Case Management Order Number 2, dated March 19, 2003, this Motion satisfies rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York.

51.    No previous request for the relief sought herein has been made to

this or any other court.

WHEREFORE the Debtors request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated:    December 1, 2003
          New York, New York

                                    /s/ Michael F. Walsh
                                    Michael F. Walsh (MFW 8000)
                                    Paul M. Basta (PMB 4434)

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, NY  10153-0119
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors and
                                     Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
```
In re                              :

                                 :       **Chapter 11 Case No.**

                                 :

**GLOBAL CROSSING LTD., et al.,**    :       **02-40188 (REG)**

                                 :

            **Debtors.**        :       **(Jointly Administered)**

                                 :
```
-----------------------------------------------------------------x
```

### ORDER PURSUANT TO SECTIONS 105(a), 363(b)(1), 1121, 1127, AND 1142(b) OF THE BANKRUPTCY CODE SEEKING APPROVAL OF (i) AN AMENDMENT TO THE DEBTORS' JOINT PLAN OF REORGANIZATION WITHOUT THE NEED FOR FURTHER SOLICITATION OF VOTES, (ii) AMENDMENT NUMBER 5 TO THE PURCHASE AGREEMENT, AND (iii) EXTENSION OF THE EXCLUSIVE PERIODS DURING WHICH DEBTORS MAY FILE A CHAPTER 11 PLAN  AND SOLICIT ACCEPTANCES THEREOF

Upon the motion, dated December 1, 2003 (the "Motion"), of Global

Crossing Ltd. ("GCL") and its debtor subsidiaries, as debtors in possession (collectively,

the "Debtors") pursuant to sections 105(a), 363(b)(1), 1121, and 1127 of title 11 of the

United States Code (the "Bankruptcy Code") seeking approval of (i) an amendment (the

"Plan Amendment") to the Debtors' Joint Plan of Reorganization (the "Plan") without the

need for further solicitation of votes, (ii) Amendment Number 5 ("Amendment No. 5") to

that certain purchase agreement (the "Purchase Agreement"), dated August 9, 2002,

among GCL, Global Crossing Holdings Ltd., the Joint Provisional Liquidators appointed

by the Supreme Court of Bermuda in joint provisional liquidation proceedings for certain

of the Debtors in Bermuda (the "JPLs"), and Singapore Technologies Telemedia Pte Ltd.

("ST Telemedia"), and (iii) an extension of the exclusive periods during which the

Debtors may file a chapter 11 plan (the "Exclusive Filing Period") and solicit acceptances

thereof (the "Exclusive Solicitation Period"), all as more fully set forth in the Motion;

and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § § 157 and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409; and due and proper notice of the Motion having been provided to the Office of the United States Trustee for the Southern District of New York, the official committee of unsecured creditors appointed in these chapter 11 cases, the attorneys for the agent to the Debtors' prepetition bank lenders, the JPLs and their attorneys, the attorneys for ST Telemedia, and those parties entitled to notice pursuant to this Court's order, dated January 28, 2002, establishing notice procedures in these cases, and no other or further notice need be provided; and the Court having reviewed the Motion and conducted a hearing with respect to the relief requested in the Motion (to the extent objections were filed); and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors and their estates and creditors; it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to section 1127 of the Bankruptcy Code, the Plan Amendment is hereby approved; and it is further

ORDERED that, pursuant to section 1127 of the Bankruptcy Code, the Debtors shall not be required to resolicit acceptances of the Plan, as amended by the Plan Amendment; and it is further

ORDERED that the Debtors are authorized to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate and implement the Plan Amendment and perform any and all obligations contemplated therein; and it is further

ORDERED that, pursuant to section 1142(b) of the Bankruptcy Code, any and all necessary parties (including, without limitation, the agent for the holders of the Debtors' prepetition bank debt) are directed to execute or deliver or to join in the execution or delivery of any instrument or document required to consummate the Purchase Agreement, and to perform any other act that is necessary for the consummation of the Plan; and it is further

ORDERED that the Debtors are directed to pay the Lender Agent Expenses (as defined in section 1.71 of the Plan), for invoices submitted to the Debtors on or before Wednesday, December 3, 2003, on the effective date of the Plan, subject to final review by the Court and the Fee Committee; and it is further

ORDERED that the Debtors are directed to pay the professional fees of XO Communications, Inc., subject to a cap of [$100,000]; and it is further

ORDERED that pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, Amendment No. 5 to the Purchase Agreement is hereby approved, and it is further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, the Debtors' Exclusive Filing Period is extended to the earlier of (i) January 5, 2004, or (ii) in the event the Purchase Agreement is terminated in accordance with its terms by any of

the parties thereto, two weeks from the date of such termination (the "Extended Exclusive Filing Period"); and it is further

ORDERED that the Exclusive Solicitation Period is extended until sixty (60) days after the Extended Exclusive Filing Period; and it is further

ORDERED that the extensions of the Exclusive Filing Period and Exclusive Solicitation Period granted herein are without prejudice to such further requests that may be made pursuant to section 1121(d) of the Bankruptcy Code by the Debtors or any party in interest, for cause shown, upon notice and a hearing; and it is further

ORDERED that notwithstanding any applicability of rules 6004(g), 7062, or 9014 of the Federal Rules of Bankruptcy Procedures, the terms and conditions of this Order shall be effective immediately and enforceable upon its entry; and it is further

ORDERED that, pursuant to Case Management Order Number 2 dated March 19, 2003, the Motion satisfies the requirements of rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York.

Dated: December __, 2003
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE